# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUE GRAHAM, individually and as the parent and natural guardian of HAILEE ANNE KUVINKA, a minor, | )<br>)<br>) |
| Plaintiffs, | ) C.A. No. 07-1640<br>) Magistrate Judge Lisa Pupo Lenihan<br>) |
| vs. | ) Re: Doc. No. 32<br>) |
| AMBRIDGE AREA SCHOOL DISTRICT, and ALAN N. FRITZ, Principal, Ambridge Area High School, and STEVE WELLENDORF, Assistant Principal, Ambridge Area High School, and BARRY KING, Assistant Principal, Ambrige Area High School, DAVID COSTANZA, an individual, and KENNETH VOSS, Ph.D., Superintendent, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION

Presently before the Court is a Motion for Summary Judgment filed by Defendants Ambridge Area School District ("School District"); Alan N. Fritz ("Fritz'), Principal; Steve Wellendorf ("Wellendorf"), Assistant Principal; Barry King ("King"), Assistant Principal; all of Ambridge Area High School; and Kenneth Voss, Ph.D., Superintendent of the School District (collectively "individual Defendants"). Defendant David Costanza ("Costanza") does not join in this motion, and consequently, the claims against him are not considered herein. For the reasons set forth below, Defendants' Motion for Summary Judgment will be denied as it relates to Defendant School District, and granted as it relates to individual Defendants Fritz, Wellendorf, King, and Voss.

**RELEVANT FACTS**

The following facts are taken from the parties' Concise Statement of Material Facts and Response thereto (Doc. Nos. 38 & 40), deposition transcripts and documentary evidence submitted by the parties. All facts are undisputed unless otherwise indicated.

Plaintiff Sue Graham ("mother-Plaintiff") commenced this action by filing a Complaint on December 3, 2007 in the United States District Court for the Western District of Pennsylvania on behalf of herself, and as the parent and natural guardian of minor Hailee Anne Kuvinka ("minor-Plaintiff") (collectively "Plaintiffs"). Plaintiffs allege that the School District and the individual Defendants violated minor-Plaintiff's civil rights pursuant to 42 U.S.C. § 1983, specifically, the right to be free from intrusions upon the integrity of her body and person pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Defendant Costanza was employed as an english and social studies teacher by Defendant School District from August 2001 to April 2007. During the school year 2006-2007, minor-Plaintiff was a tenth grade student in Defendant Costanza's social studies class. Also during the 2006-2007 academic year, Defendant Fritz was the principal at Ambridge Area High School, part of Defendant School District, Defendants King and Wellendorf were assistant principals, and Defendant Voss was Superintendent of Defendant School District. Defendant Costanza's father, Charles Costanza, was the president of the Ambridge Area School Board during the 2007 academic year, and a long standing member of the School Board.

Defendant Costanza engaged in illegal sexual contact with minor-Plaintiff when she was 15 years old. In his capacity as junior varsity baseball coach, he selected minor-Plaintiff as a

score keeper for the team.[1]  Minor-Plaintiff made no reports to school administrators or her mother regarding inappropriate sexual conduct by Defendant Costanza.  Principal Fritz testified that he first became aware of an on-going, inappropriate sexual relationship between minor-Plaintiff and Defendant Costanza on April 4, 2007, when minor-Plaintiff's brother and then girlfriend, Jessica McMurray, provided him with minor-Plaintiff's cell phone.  The cell phone contained sexually explicit communications between minor-Plaintiff and Costanza.  (Doc. No. 38-10 at 2-4.)  On that same day, Principal Fritz contacted mother-Plaintiff and requested that she come to the school; he also contacted the Ambridge police who were involved from that point forward.  Defendant Costanza pleaded nolo contendere to statutory sexual assault, was incarcerated, fined and released on probation.

The parties dispute the number of complaints received by Defendant School District regarding Defendant Costanza during the course of his employment.  The parties do agree that in February 2006, Principal Fritz placed a disciplinary memo in Defendant Costanza's file (with a copy to Defendant Voss) regarding a sexually suggestive test question.  Specifically, the test question contained language that "Mr. Costanza looks sexy in spandex bike pants."  Fritz's February 2006 memo provides in relevant part as follows:

> I realize the desire to enter levity into your teaching and recognize the positive influence that levity can have in a classroom situation.  You, especially as a young, male teacher, must be sure that the levity you attempt to provide does not cross [sic] line of appropriateness.
> Please ensure that any future test questions, class discussions, and other conversations held by you and your students do not contain any sexual reference,

---

[1] Minor-Plaintiff testified that she applied for the scorekeeper position so that she would have more activities to add to her application to the National Honor Society.  (Kuvinka Dep. at 21.)  The position involved keeping the books during baseball games, and general managerial tasks such as handling the equipment.  (Kuvinka Dep. at 22.)

3

> innuendo or suggestion of inappropriate relationships between the teacher and
> students.
> In our profession, the perception of any inappropriate contact can easily be
> manipulated into a situation that negatively affects the teacher, the school and
> most importantly the students.

(Doc. 32-3 at 1.)

The parties dispute whether this test question was the only reason that the disciplinary memo was placed in Defendant Costanza's file. Defendant Fritz testified in deposition that his memorandum to Defendant Costanza addressed situations beyond test questions (including class discussions and conversations) and emphasized that any of these communications should be devoid of any sexual reference, innuendo or suggestion of inappropriate relationships between teacher and student, because Fritz "wanted to make sure that there was no room for this type of thing to happen." (Fritz Dep. at 48.) Although Fritz testified that he had received no complaints about Costanza by February 2006, he did indicate that he had heard rumors by this time. (Fritz Dep. at 50.) Fritz described the rumor as information from a student who approached him directly, and unsolicited, that a female student was "spending an exorbitant amount of time in Defendant Costanza's classroom." (Fritz Dep. at 51.) Fritz identified the source of this information as Jessica McMurray. (Fritz Dep. at 58.)

Jessica McMurray testified that as a student of Defendant Costanza for two academic years, she and other female students were the recipients of Costanza's frequent crude and sexually explicit comments and actions during classroom instruction that grew more egregious with time. (McMurray Dep. at 9.) This behavior was not limited to her class. (McMurray Dep. at 15.) Costanza's comments and actions included innuendo as to the size of female students' breasts, a sign-up board in his classroom to dance with him at the Sadie Hawkins dance, the use of sexually

4

suggestive music relating to masturbation accompanying a slide presentation that had no relationship to the subject matter of the presentation: Chinese leader Ho Chi Minh. During a class discussion that referenced birth control, McMurray testified that Costanza used a slide that had no direct relationship to the discussion: a picture of a double XL condom. (McMurray Dep. at 11-13.) One day, when McMurray and other students were leaving class, she described the following incident regarding a sweater:

> [Costanza] held up a sweater not like a coat but like a sweater that you would wear just over top of your skin, and he said does this belong to anyone in this class, and we're like no. He was like, okay. It must be from that girl from after school.

McMurray Dep. at 20.

McMurray further testified that initially, she made a verbal complaint to Principal Fritz. (McMurray Dep. at 9-10, 18, 22.) According to McMurray, Principal Fritz told her that "in order for them to take action," she would have to place her complaints in writing. (McMurray Dep. at 17.) McMurray testified that she wrote a 3-4 page letter to Principal Fritz, and that he instructed her to record any further incidents in her subject notebook. (McMurray Dep. at 9-10.) The three-to four page letter, however, was not produced in discovery. In addition, McMurray testified that she was unable to locate her copy of the letter (McMurray Dep. at 20), or her subject notebook.

McMurray indicated that she believed Defendant Costanza had learned of her complaints because he made the following jokes: On his instant messaging "away screen," he placed the message "I've been fired," when he really hadn't been fired.[2] In addition, the day following her

---

[2]Costanza communicated with his students through an AIM (America Online Instant Messaging Account) which had the address "IloveC231". This account was not a school account. His personal AIM address, which he provided to certain students including minor-Plaintiff when she became a scorekeeper, was "loverboy878".

5

complaints to Fritz, Costanza informed the class that "we can't have fun anymore because I got in trouble," and looked at McMurray intimating that it was she who had complained. (McMurray Dep. at 10.)

McMurray also testified that there were rumors at school of an alleged sexual relationship between another student (other than minor-Plaintiff)[3] and Defendant Costanza. (McMurray Dep. at 27-28.) As noted above, Principal Fritz indicated that he became aware of the rumors concerning a student who was spending an "exorbitant" amount of time in Costanza's classroom. Principal Fritz testified that before February 2006, he became aware of rumors that Defendant Constanza was involved in an inappropriate sexual relationship with a female student. Assistant Principal Wellendorf testified that he learned about the other student when he happened to walk into Fritz's office during a conversation he was having with McMurray who was voicing concerns to Fritz about this student spending a lot of time in Costanza's classroom. (Wellendorf Dep. at 48-49.) Wellendorf indicated that he volunteered to undertake the task of speaking to the other student and her family and did speak to the student and her father that same day. (Wellendorf Dep. at 51-53, 68.) Principal Fritz indicated that Wellendorf, who knew the family and attended the same church, initiated the conversation with the female student's family[4]. According to Fritz, this female student's father had heard the rumors, questioned his daughter, and indicated that he intended to take her to the gynecologist to have her examined "to prove nothing had happened." (Fritz Dep. at 59) Fritz further testified that he did not confront Defendant Costanza with the

---

[3] This student had also served as a baseball scorekeeper for Defendant Costanza.

[4] According to Defendant Wellendorf, the other female student's father worked at a seminary that was connected with the church that Wellendorf attends. (Wellendorf Dep. at 53-54.)

6

rumors because they were denied by the female student and "her parents and [Fritz] didn't want to go up and make an accusation to a teacher that would be unfounded." (Fritz Dep. at 68.)

Defendant Costanza contradicts Fritz's testimony and testified that Principal Fritz did speak to him about this alleged sexual contact with the other student. (Costanza Dep. at 83-84.) Defendant Costanza testified that he denied having any type of inappropriate relationship with the other student to Principal Fritz. (Costanza Dep. at 83.) Defendant Costanza further testified that Fritz indicated that there were complaints that he was overly friendly with the other student and that he had given her a Valentine's gift. Costanza also testified to the following statement made by Fritz during a meeting with Costanza: "I don't know what you are doing, and I don't want to know, but people are talking." (Costanza Dep. at 105.) Minor-Plaintiff, however, testified that Defendant Costanza told her that he did have inappropriate sexual contact with the other student, but did not have sexual intercourse with her. (Kuvinka Dep. at 48.) Finally, Costanza testified that to his knowledge, there was no written documentation reflecting his interaction with Principal Fritz regarding the other student. (Costanza Dep. at 86.)

Fritz also testified that he telephoned Superintendent Voss to inform him about the rumors involving the other student, and that Voss inquired as to whether the administration spoke to the parents. (Fritz Dep. at 72.) Defendant Voss testified that he did not recall having this phone conversation with Fritz, but only remembers becoming aware of the incident simultaneously with the situation involving minor-Plaintiff. (Voss Dep. at 57.) Voss indicated that if principal Fritz had obtained information about the possibility of a sexual relationship between the other student and Defendant Costanza, he would have expected this information to be brought to his attention, and he would have expected to participate in a subsequent investigation. (Voss Dep. at 39.)

Defendant Costanza did not receive any discipline resulting from the above facts; the February 16, 2006 memorandum was placed in his file.

Almost one year later, in January 2007, a parent complained to Vice Principal King that Defendant Costanza had referred to her son as "looking like a lesbian truck driver." Both Vice Principals Wellendorf and King interviewed the parent. Wellendorf and King immediately investigated this complaint and in doing so, questioned several additional students. King and Wellendorf were informed that Defendant Costanza flirted with female students, commented on the way girls looked, inquired about students' personal lives including dating and socializing, and communicated privately with students outside of school hours using emails, text messaging, and computer messaging services about personal, non-academic topics, and transported students in his car. Other complaints included referring to an overweight male student as a "hippo", and his failure to stand, recite or maintain silence during the "Pledge of Allegiance", such that students wishing to stand and recite the pledge were too embarrassed to do so. Finally, due to "feelings of overall discomfort" caused by Costanza's unprofessional conduct, students were removed from his homeroom and reassigned in response to parental requests. The investigation included questioning several reliable students, none of whom were involved in the initial complaint. Defendants, however, failed to document this investigation. Hence, there is no written record as to who reported the various complaints, the details of the complaints, or the timing and sequence of complaints. This investigation resulted in a formal written warning: a written outline of unprofessional conduct as defined under the Pennsylvania Code of Conduct; a written improvement plan; and a meeting among Vice Principals Wellendorf, and King, Principal Fritz, and Costanza. Superintendent Voss also met with Costanza concerning the January 2007

complaint. Defendant Voss authored a letter of reprimand and warning of suspension or dismissal dated February 2, 2007; this letter was also placed in Costanza's personnel file.

The record does not reflect that Costanza's official school activities involving students outside the classroom were either curtailed or monitored. Defendant Costanza continued to transport students in his private vehicle after school and testified that he probably would not have if he believed that officials from the school would be monitoring him. (Costanza Dep. at 67.) In addition, he continued to communicate with students via cell phone text messaging. (Doc. No. 38-10). Defendant Costanza continued to have inappropriate communications and contact with at least one female student culminating in the events of April 4, 2007.[5]

There is no record evidence that Principal Fritz actually knew of an inappropriate sexual relationship between minor-Plaintiff and Defendant Costanza before April 4, 2007. Plaintiff-Mother was also unaware of the sexual relationship between minor-Plaintiff and Defendant Costanza. Vice Principal Wellendorf, Vice Principal King, and Superintendent Voss also had no actual knowledge of the inappropriate sexual relationship between minor-Plaintiff and Defendant Costanza.

**LEGAL STANDARD**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving

---

[5]Minor-Plaintiff testified that she communicated only once with Defendant Costanza about school related matters via AIM. On personal matters, however, she communicated with him nightly via AIM from February to March. (Kuvinka Dep. at 34.) After she was selected to be a scorekeeper, she and Costanza exchanged cell phone numbers and their communications continued via cell phone text messaging. (Kuvinka Dep. at 33-34.) By March, the content of the text messages became sexual. (Kuvinka Dep. at 36.)

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. Id. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by Matsushita Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986). In Anderson, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Id. at 249-50 (internal citations omitted).

While any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. See Fed. R. Civ. P. 56 (e); Celotex Corp., 477

10

U.S. at 324; J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990). The non-movant cannot rely solely on unsupported assertions or conclusory allegations. Anderson, 477 U.S. at 249.

Here, Defendants contend that they are entitled to judgment as a matter of law on Plaintiffs' claims and argue the following: (1) Discovery has revealed no evidence that a policy practice or custom directly caused minor-Plaintiff's constitutional harm; (2) Defendants were not deliberately indifferent to the harm suffered by minor-Plaintiff; and (3) the school district administrators were acting in their official capacities as employees of Defendant School District and therefore, cannot be held liable in their individual capacities. Plaintiffs respond that record evidence reveals specific facts showing that there are genuine issues for trial.

## **ANALYSIS**

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. Thus, to state a claim for relief under this provision, the Plaintiffs must demonstrate that the conduct in the Amended Complaint was committed by a person or entity acting under color of state law and that such conduct deprived the Plaintiffs of rights, privileges or immunities secured by the Constitution or the laws of the United States. Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994). The parties do not dispute that the Defendants here are persons or entities acting under color of state law. In

addition, it is well settled that school students have a constitutional right to be free "from invasion of [their] personal security through sexual abuse." Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989). Clearly, "a teacher's sexual molestation of a student is an intrusion of the schoolchild's bodily integrity." Id. at 727.

I. **Section 1983 Claim against Defendant School District**

Plaintiffs claim that the School District received notice of numerous instances of inappropriate conduct on the part of Costanza, and that despite this notice, Defendant School District failed to investigate or initiate remedial action, and thereby, adopted a plan, policy or custom that such behavior would be condoned. In the alternative, Plaintiff claims that to the extent that Defendant School District had a policy, practice or custom to prevent such conduct, the School District, acting through its employees, made a conscious decision not to enforce such policy or practice against Costanza. (Amended Complaint, Doc. No. 24 at ¶¶ 24-41.)

Defendant School District moves for summary judgment on this claim arguing that the evidence revealed in discovery demonstrates that the School District investigated all concerns brought to its attention concerning Costanza, and "that there was absolutely no attempt by the School District or its employee Defendants to deny, cover-up, condone, minimize or falsify Costanza's behavior . . . ." (Brief in Support of Motion for Summary Judgment, Doc. No. 33 at 9.)

In Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978), the United States Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983. In so ruling, however, the Court declared that

municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, that is, through application of the doctrine of respondeat superior. Instead, the Court concluded that a governmental unit may be liable under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. Id.

In order to hold a school district liable pursuant to § 1983 for the sexual abuse of a student by one of its teachers, Plaintiffs must show that the School District: (1) had a policy, practice, or custom which played an affirmative role in bringing about the sexual abuse, and (2) that the School District acted with deliberate indifference to that abuse. Black v. Indiana Area Sch. Dist., 985 F.2d 707, 712 (3d Cir. 1993). A custom or practice, although not authorized by law, may consist of a course of conduct so permanent and widespread that it has the force of law. Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990). In Stoneking, the United States Court of Appeals for the Third Circuit set forth the standard for determining whether a school district establishes a policy, practice, or custom that results in the kind of constitutional violation at issue here. "[A]lthough the mere failure of supervisory officials to act or investigate cannot be the basis of liability," school officials may not "maintain a custom, practice or usage that communicate[s] condonation or authorization of assaultive behavior." Stoneking, 882 F.2d at 730.

In Stoneking, the United States Court of Appeals for the Third Circuit concluded that there was enough evidence for a jury to reasonably conclude that the actions taken by the

13

principal and assistant principal amounted to a custom, practice, or policy which facilitated and condoned sexual abuse of female students by teachers in violation of the plaintiff's constitutional right to be free from intrusions of her bodily integrity. 882 F.2d at 725, 730-31. At least five complaints of sexual assaults by teachers and staff members were reported to the principal and assistant principal. The principal recorded the allegations and placed them in a secret file in his home, rather than in the teachers' personnel files. The court indicated that a jury could view these actions by the principal as active concealment. Id. at 729. School officials continued to give the perpetrators excellent performance evaluations in the face of the complaints of sexual abuse. The Stoneking court concluded that a jury could view these evaluations "as communication by defendants to the teachers that the conduct of which they were accused would not be considered to reflect negatively on them[.]" Id. In certain situations, the principal and assistant principal intimidated and discouraged students and parents from pursuing their complaints, and in one instance, a student was forced "to publicly recant her allegation." Id. The Stoneking court concluded that these actions, in conjunction with defendants' failure to investigate the complaints of sexual abuse, "created a climate which, at a minimum, facilitated sexual abuse of students by teachers." Id. at 725. Hence, the evidence produced in discovery supported "a sufficiently tenable theory that there was an 'affirmative link' between [plaintiff's] injury and the policies and practices that [defendants] employed and affirmative acts they took in furtherance of them to make this a jury issue." Id. at 730-31 (internal citation omitted). Similarly, as to establishing deliberate indifference on the part of a school district, "something more culpable must be shown than a negligent failure to recognize a high risk of harm to plaintiff[]." Black, 985 F.2d at 712-13 (citing Colburn v. Upper Darby, 946 F.2d 1017, 1025 (3d Cir. 1991)). The issue here is whether a

14

reasonable jury could conclude that, prior to the sexual abuse of minor-Plaintiff, a substantial danger existed that Costanza would invade the bodily integrity of a female student, and that the School District was aware of this danger.

Here, there is sufficient record evidence for a reasonable jury to conclude that the actions taken by school officials amounted to a custom, practice or policy which condoned Costanza's sexually inappropriate behaviors, and thereby facilitated, the sexual abuse of minor-Plaintiff by teacher Costanza in violation of the minor-Plaintiff's constitutional right to be free from intrusions of her bodily integrity.

First, with regard to the inappropriate test question, there is disputed record evidence as to why Principal Fritz used language in his February 2006 memorandum to Costanza regarding inappropriate relationships between teachers and students. Principal Fritz admitted that a student had approached him about a female student who was allegedly spending an exorbitant amount of time in Costanza's classroom. Assistant Principal Wellendorf testified that school officials found this complaint to be unusual. Defendant Costanza testified that contrary to Principal Fritz's testimony, Fritz did discuss this issue with him, and told him "I don't know what you are doing, and I don't want to know, but people are talking." A reasonable jury could conclude that Fritz did not want to know whether Costanza was engaging in an inappropriate relationship with a student, and that the articulation of his desire "not to know" was in fact, a condonation of Costanza's sexually inappropriate behaviors. Further, Fritz's desire "not to know" and his concerns that "people are talking" could lead a reasonable jury to conclude that Fritz wanted to cover up the relationship if one existed. Moreover, a reasonable jury could conclude that Fritz's comments could serve as a communication to Costanza that his inappropriate sexual behaviors

would continue to go unchecked as long as Costanza remained discreet.

Thereafter, when Jessica McMurray complained of the numerous instances of highly inappropriate sexual comments and conduct of Defendant Costanza, ( at least one of which was highly suggestive of inappropriate sexual contact with a female student after school hours), the 3 to 4 page complaint was not placed in Defendant Costanza's personnel file, and in fact, was not found for production in discovery. A reasonable jury could again conclude that Principal Fritz and other school officials condoned Costanza's behavior, actively concealed McMurray's detailed written complaint, and again served to facilitate Costanza's future inappropriate sexual behaviors with his students. Although Principal Fritz instructed McMurray to place her complaints in writing "in order for [school officials] to take action," McMurray was never contacted again by school officials regarding her written complaint, and no record evidence reflects that any investigation of McMurray's complaints ensued. Although it became clear to McMurray that her complaints were communicated to Costanza, a reasonable jury could further conclude from his jokes on his AIM "away message" and to his class directly, that any official reprimand was mild at best, again communicating official condonation of Costanza's behavior. Finally, a reasonable jury could also conclude that the District's failure to appropriately respond to the student complaints of Costanza's sexually inappropriate comments and behaviors were related to the fact that his father was the president of the school board.

The record also reflects that a jury could reasonably conclude that Costanza's behavior was tolerated by the School District for almost another year until January 2007, when the School District received complaints from not only students, but also "multiple" parents (Doc. No. 36-4 at 15.) Assistant Principal Wellendorf stated in his January 12, 2007 memorandum to Defendant

Costanza that these complaints "prompted" he and Assistant Principal King "to interview students who were alleged witnesses of unprofessional behavior." (Doc. No. 36-4 at 15.) By this time, however, Costanza admitted that he continued to use his private vehicle to transport students in direct violation of the terms of his Improvement Plan (Doc. No. 36-4 at 18), and probably would not have if he knew his actions were being monitored by the School District. Likewise, in direct violation of his Improvement Plan, record evidence shows that he continued to engage in personal communications with students using his personal AIM accounts and cell phone text messaging, which eventually lead to the sexual abuse of minor-Plaintiff. A reasonable jury could conclude that the School District's long standing condonation of Costanza's sexual behaviors in and outside the classroom facilitated the abuse on minor-Plaintiff.

Principal Fritz's statement to Costanza that "he did not want to know what he was doing" could lead a reasonable jury to conclude that the School District was deliberately indifferent to the danger that Defendant Costanza posed to his students.

In conclusion, drawing all inferences in favor of the nonmoving party, the Plaintiffs have set forth specific facts showing that there is a genuine issue for trial on their claim against Defendant School District. It is not the province of the Court to engage in a weighing of the evidence, and the Court offers no comment on the truth of the Plaintiffs' position. The Court only finds that there is sufficient evidence favoring the Plaintiffs such that a reasonable jury could return a verdict for them.

Therefore, the Defendant School District's Motion for Summary Judgment will be denied.

## II. Section 1983 Claim against Individual Defendants Fritz, Wellendorf, King and Voss[6]

Plaintiffs also claim that the individual Defendants "had responsibility for the oversight and supervision of teacher employees" at Defendant School District (Amended Complaint, Doc. No. 24 at ¶ 43), and were aware, or should have been aware of Defendant Costanza's inappropriate behavior, and failed to investigate and initiate effective remedial action. (Amended Complaint, Doc. No. 24 at ¶¶ 42-59.)

As discussed above with regard to municipal liability, these individual Defendants cannot be liable under § 1983 simply because they were employed by Defendant School District and possessed some supervisory authority over Costanza. Instead, these individual Defendants must have in some way caused the deprivation of Plaintiff's Fourteenth Amendment Due Process rights. District courts within the Third Circuit have adopted the following test formulated by the Fifth Circuit Court of Appeals to determine whether supervisory school personnel could be individually liable under § 1983 when a subordinate violates a school student's constitutional right to bodily integrity in physical sexual abuse cases:

> (1) the [supervisory] defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and
> (2) the [supervisory] defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and
> (3) such failure caused a constitutional injury to the student.

---

[6]These individual Defendants are sued only in their individual capacities. Defendants moved to dismiss any claims against them in their official capacities. The Court granted Defendants' Motion to Dismiss as any claims against them in their official capacities are, in essence, claims against the School District. A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 580 (3d Cir. 2004).

Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 454 (5th Cir. 1994) (en banc), quoted in, Chancellor v. Pottsgrove Sch. Dist., 501 F. Supp.2d 695, 709 (E.D. Pa. 2007); D.C.G. v. Wilson Area Sch. Dist., No. 07-cv-1357, 2009 WL 838548 (E.D. Pa. March 27, 2009); Maier v. Canon McMillan Sch. Dist., 08-cv-0154, 2009 WL 2591098 (W.D. Pa. August 20, 2009). The Chancellor court noted that this test is consistent with case law from the United States Court of Appeals for the Third Circuit indicating that supervisory liability requires that the supervisor "had knowledge of and acquiesced in" the subordinate's violations. Chancellor, 501 F. Supp.2d at 710 (quoting A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)).

The parties do not dispute that none of these individual Defendants was aware that Costanza was sexually abusing minor-Plaintiff. Nor is there any record evidence to suggest that any of them were aware of any inappropriate sexual behavior "pointing plainly toward the conclusion that [Costanza] was sexually abusing [minor-Plaintiff]." Doe, 15 F.3d at 454  The legal threshold with regard to supervisory liability is quite high; as a matter of law, Plaintiffs have set forth insufficient evidence to meet this standard[7].

Therefore, the individual Defendants' Motion for Summary Judgment will be granted. An appropriate order will follow.

---

[7]The individual Defendants argue that because the Court dismissed the claims against them in their official capacities, the claims against them in their individual capacities must also be dismissed because at all relevant times, they acted in their official capacities as representatives of Defendant School District. The individual Defendants misconstrue the distinction between personal and official capacity suits. "In personal capacity suits, a plaintiffs seeks to impose personal liability upon an individual officer and recover from the personal assets of that officer." Garden State Elec. Inspection Servs., Inc. v. Levin, 144 Fed. Appx. 247, 251 (3d Cir. 2005). It is irrelevant if the officer, sued in her personal capacity, was at all times acting in her official capacity. See Hafer v. Melo, 502 U.S. 21, 27-29 (1991).

Dated: May 26, 2010

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc: All counsel of record
*Via electronic filing*